Slip Op. 14-43

UNITED STATES COURT OF INTERNATIONAL TRADE

| | |
|---|---|
| HUBSCHER RIBBON CORP., LTD., <br><br> Plaintiff, <br><br> v. <br><br> UNITED STATES, <br><br> Defendant. | Before: Leo M. Gordon, Judge <br><br> Court No. 13-00071 <br><br> **PUBLIC VERSION** |

**OPINION**

[Final results of administrative review sustained.]

Dated: April 15, 2014

    John J. Kenkel, Gregory S. Menegaz, and J. Kevin Horgan, deKieffer & Horgan, of Washington, DC, for Plaintiff Hubscher Ribbon Corp., Ltd.

    Ryan M. Majerus, Trial Attorney, Commercial Litigation Branch, Civil Division, U.S. Department of Justice, of Washington, DC, for Defendant United States. With him on the briefs were Stuart F. Delery, Assistant Attorney General, Jeanne E. Davidson, Director, Patricia M. McCarthy, Assistant Director. Of counsel on the briefs was Scott D. McBride, Senior Attorney, U.S. Department of Commerce, Office of the Chief Counsel for Import Administration, of Washington, DC.

    Gregory C. Dorris, Pepper Hamilton, LLP, of Washington, DC, for Defendant-Intervenor Berwick Offray, LLC.

    Gordon, Judge: This action involves an administrative review conducted by the U.S. Department of Commerce ("Commerce") of the antidumping duty order covering narrow woven ribbons with woven selvedge from the People's Republic of China. See Narrow Woven Ribbons with Woven Selvedge from the People's Republic of China, 78 Fed. Reg. 10,130 (Dep't of Commerce Feb. 13, 2013) (final results admin. review) ("Final Results"); see also Issues and Decision Memorandum for the Final Results of the

Antidumping Duty Administrative Review on Narrow Woven Ribbons with Woven Selvedge from the People's Republic of China, A-570-952 (Dep't of Commerce Feb. 5, 2013) ("<u>Decision Memorandum</u>"), <u>available at</u> http://enforcement.trade.gov/frn/summary/prc/2013-03236-1.pdf (last visited this date). Before the court is Plaintiff Hubscher Ribbon Corp., Ltd.'s ("Hubscher") motion for judgment on the agency record challenging Commerce's assignment of a total adverse facts available ("AFA") rate of 247.65%. <u>See</u> Pl.'s R. 56.2 Mem. in Supp. of Mot. for J. on the Agency R. at 3, ECF No. 33 ("Pl.'s Br."). The court has jurisdiction pursuant to Section 516A(a)(2)(B)(iii) of Tariff Act of 1930, as amended, 19 U.S.C. § 1516a(2)(B)(iii) (2006),[1] and 28 U.S.C. § 1581(c) (2006). For the reasons set forth below, the court sustains the <u>Final Results</u>.

## I. Background

During the less than fair value ("LTFV") investigation, Commerce assigned dumping margins of 0.00% to Yama Ribbons and Bows Co., Ltd. ("Yama"), the sole cooperative mandatory respondent, 123.83% for the separate rate respondents, and 247.65% as total adverse facts available ("AFA") for (1) the China-wide entity and (2) the uncooperative mandatory respondent Ningbo Jintian Import & Export Co., Ltd. ("Ningbo"). <u>Narrow Woven Ribbons with Woven Selvedge from the People's Republic of China</u>, 75 Fed. Reg. 41,808, 41,811 (Dep't of Commerce July 19, 2010) (final determ.) ("<u>LTFV Final Results</u>").

---

[1] Further citations to the Tariff Act of 1930, as amended, are to the relevant provisions of Title 19 of the U.S. Code, 2006 edition, and all applicable supplements.

The separate rate of 123.83% was the subject of interesting litigation. One of the separate rate respondents, Yangzhou Bestpak Gifts & Crafts Co. ("Bestpak"), challenged the reasonableness of the 123.83% separate rate, which Commerce derived by simply averaging Yama's de minimis rate and Ningbo's total AFA rate (which was derived from the petition). The U.S. Court of International Trade ("CIT") was initially skeptical that such a simple average constituted a "reasonable method" to derive the separate rate, assuming there might be other options from the administrative record, and remanded to Commerce for further consideration. Yangzhou Bestpak Gifts & Crafts Co. v. United States, 35 CIT ___, ___, 783 F. Supp. 2d 1346, 1350-53 (2011), after remand, 36 CIT ___, 825 F. Supp. 2d 1346 (2012), vacated by 716 F.3d 1370 (Fed. Cir. 2013). On remand, Commerce explained that there was very limited data upon which to determine the commercial reality of the separate rate respondents. Bestpak, 36 CIT at ___, 825 F. Supp. 2d at 1350-51. The CIT acknowledged the limited record data and sustained Commerce's explanation as reasonable (supported by substantial evidence), albeit reluctantly. It explained the challenges that limited data pose for Commerce, the interested parties, and the court, especially when drawing conclusions about what constitutes a reasonable measure for the separate rate. Id. 36 CIT at ___, 825 F. Supp. 2d at 1350-53.

On appeal the U.S. Court of Appeals for the Federal Circuit ("Federal Circuit") rejected the reasonableness of Commerce's simple average that incorporated a total AFA rate for otherwise cooperative, separate rate respondents, noting that Commerce was to blame for the limited record, having had ample time to select another mandatory

Court No. 13-00071                                                                                          Page 4

respondent when Ningbo withdrew its participation.  <u>Bestpak</u>, 716 F.3d at 1378-80.  On remand Commerce chose to review Bestpak individually and calculate its actual rate.  Despite Bestpak maintaining through the course of the litigation that it deserved a zero percent rate, <u>Bestpak</u>, 35 CIT at ___, 825 F. Supp. 2d at 1350 ("Bestpak, for its part, requests an order from the court directing Commerce to assign Bestpak a 0% rate."), 716 F.3d at 1381-82 ("Bestpak . . . argued that the sample invoice was evidence of its commercial behavior and strongly supported a determination that Bestpak was entitled to a zero dumping rate."), Bestpak voluntarily dismissed the litigation rather than be individually reviewed, conceding that all its entries would be covered by the 123.83% separate rate.  <u>See</u> Form 8 Notice of Dismissal, <u>Yangzhou Bestpak Gifts & Crafts Co. v. United States</u>, No. 10-00295 (USCIT Nov. 13, 2013), ECF No. 76 ("Yangzhou Bestpak will remain subject to the antidumping duty order on narrow woven ribbon with woven selvedge from the People's Republic of China at the antidumping duty rate of 123.83%, and all of Bestpak's entries suspended in this action will be liquidated at that rate.").  One wonders what Bestpak's actual rate and commercial reality would have been had Commerce completed the individual review.  Would it have been higher than 123.83%?  In any event, although seemingly struck down by the Federal Circuit as unreasonable, the 123.83% separate rate now appears to have regained some validity.

      In the subsequent first administrative review Commerce selected and examined Hubscher, an exporter, as the only mandatory respondent.  No other respondents were individually reviewed.  <u>Narrow Woven Ribbons with Woven Selvedge from the People's Republic of China</u>, 77 Fed. Reg. 47,363, 47,363-64 (Dep't of Commerce Aug. 8, 2012)

Court No. 13-00071	Page 5

(prelim. results admin. review) ("Preliminary Results").  Hubscher at first cooperated, reporting among its questionnaire responses that Yama produced all of the subject merchandise that Hubscher imported during the period of review.  When it came time to submit its cost information, however, Hubscher withdrew from the administrative review.  Hubscher Letter Re: Withdrawal from Administrative Review, at 1-2 (Dep't of Commerce May 29, 2012), PD 68.[2]

Commerce then applied total AFA to Hubscher.  Preliminary Results, 77 Fed. Reg. at 47,367; Decision Memorandum at 2.  Commerce selected 247.65%, "the highest rate alleged in the petition," as the total AFA rate.  Preliminary Results, 77 Fed. Reg. at 47,368 ("To determine the relevance of the petition margin, we placed the model-specific rates calculated for the respondents in the LTFV investigation on the record of this segment of the proceeding and compared the 247.65 percent rate with those model-specific rates."); see also Final Results, 78 Fed. Reg. at 10,133; Decision Memorandum at 8-10 & n.26; Comments and Departmental Position Containing Proprietary Information (Dep't of Commerce Feb. 5, 2013), CD 30 ("Corroboration Memorandum").  Although Hubscher admits "that it did not fully participate in the first administrative review and deserves a dumping margin based on 'adverse facts available,'" Pl.'s Br. at 17; see 19 U.S.C. § 1677e(a), Hubscher argues that Commerce unreasonably applied the highest petition rate as total AFA.  Pl.'s Br. at 3, 17.  For the reasons set forth below, the court sustains the Final Results.

---

[2] "PD" refers to a document contained in the public administrative record.  "CD" refers to a document contained in the confidential record.

## II. Standard of Review

For administrative reviews of antidumping duty orders, the court sustains Commerce's "determinations, findings, or conclusions" unless they are "unsupported by substantial evidence on the record, or otherwise not in accordance with law."  19 U.S.C. § 1516a(b)(1)(B)(i).  More specifically, when reviewing agency determinations, findings, or conclusions for substantial evidence, the court assesses whether the agency action is reasonable given the record as a whole.  Nippon Steel Corp. v. United States, 458 F.3d 1345, 1350-51 (Fed. Cir. 2006).  Substantial evidence has been described as "such relevant evidence as a reasonable mind might accept as adequate to support a conclusion."  DuPont Teijin Films USA v. United States, 407 F.3d 1211, 1215 (Fed. Cir. 2005) (quoting Consol. Edison Co. v. NLRB, 305 U.S. 197, 229 (1938)).  Substantial evidence has also been described as "something less than the weight of the evidence, and the possibility of drawing two inconsistent conclusions from the evidence does not prevent an administrative agency's finding from being supported by substantial evidence." Consolo v. Fed. Mar. Comm'n, 383 U.S. 607, 620 (1966).  Fundamentally, though, "substantial evidence" is best understood as a word formula connoting reasonableness review.  3 Charles H. Koch, Jr., Administrative Law and Practice § 9.24[1] (3d. ed. 2014). Therefore, when addressing a substantial evidence issue raised by a party, the court analyzes whether the challenged agency action "was reasonable given the circumstances presented by the whole record." Edward D. Re, Bernard J. Babb, and Susan M. Koplin, 8 West's Fed. Forms, National Courts § 13342 (2d ed. 2013).

Separately, the two-step framework provided in Chevron, U.S.A., Inc. v. Natural

Res. Def. Council, Inc., 467 U.S. 837, 842-45 (1984), governs judicial review of Commerce's interpretation of the antidumping statute. See United States v. Eurodif S.A., 555 U.S. 305, 316 (2009) (Commerce's "interpretation governs in the absence of unambiguous statutory language to the contrary or unreasonable resolution of language that is ambiguous.").

### III. Discussion

In a total AFA scenario like the one presented here, Commerce typically cannot calculate an antidumping rate for an uncooperative respondent because the information required for such a calculation (in this case the respondent's cost information for the subject merchandise during the period of review) has not been provided. As a substitute, Commerce relies on various "secondary" sources of information (the petition, the final determination from the investigation, prior administrative reviews, or any other information placed on the record), 19 U.S.C. § 1677e(b), (c), to select a proxy that should be a "reasonably accurate estimate of the respondent's actual rate, albeit with some built-in increase intended as a deterrent to noncompliance." F.LLI de Cecco Di Filippo Fara S. Martino S.p.A. v. United States, 216 F.3d 1027, 1032 (Fed. Cir. 2000) ("de Cecco").

When selecting an appropriate total AFA proxy, "Commerce must balance the statutory objectives of finding an accurate dumping margin and inducing compliance." Timken Co. v. United States, 354 F.3d 1334, 1345 (Fed. Cir. 2004). The proxy's purpose "is to provide respondents with an incentive to cooperate, not to impose punitive, aberrational, or uncorroborated margins." de Cecco, 216 F.3d at 1032. Although a higher AFA rate creates a stronger incentive to cooperate, "Commerce may not select

unreasonably high rates having no relationship to the respondent's actual dumping margin." Gallant Ocean (Thailand) Co. v. United States, 602 F.3d 1319, 1323 (Fed. Cir. 2010) (citing de Cecco, 216 F.3d at 1032). "Commerce must select secondary information that has some grounding in commercial reality." Id. 1323-24.

As de Cecco explained, these requirements are logical outgrowths of the statute's corroboration requirement, see de Cecco, 216 F.3d at 1032, which mandates that Commerce, to the extent practicable, corroborate secondary information with independent sources reasonably at its disposal. 19 U.S.C. § 1677e(c). In practice "corroboration" involves confirming that secondary information has "probative value," 19 C.F.R. § 351.308(d) (2013), by examining its "reliability and relevance." Mittal Steel Galati S.A. v. United States, 31 CIT 730, 734, 491 F. Supp. 2d 1273, 1278 (2007) (citing Ball Bearings and Parts Thereof from France, Germany, Italy, Japan, Singapore, and the United Kingdom, 70 Fed. Reg. 54,711, 54,712-13 (Dep't of Commerce Sept. 16, 2005) (final results admin. reviews)). More simply, to corroborate the selection of a total AFA rate, Commerce must, to the extent practicable, "demonstrate that the rate is reliable and relevant to the particular respondent" in light of the whole record before it. Yantai Xinke Steel Structure Co. v. United States, 36 CIT ___, ___, Slip Op. 12-95 at 27 (July 18, 2012); PSC VSMPO-AVISMA Corp. v. United States, 35 CIT ___, ___, 755 F. Supp. 2d 1330, 1336-37 (2011) (citing Gallant Ocean, 602 F.3d at 1323-24); de Cecco, 216 F.3d at 1032 ("Obviously a higher adverse margin creates a stronger deterrent, but Congress tempered deterrent value with the corroboration requirement. It could only have done so to prevent the petition rate (or other adverse inference rate), when unreasonable, from

prevailing and to block any temptation by Commerce to overreach reality in seeking to maximize deterrence.").

Before turning to the specific facts, the court addresses Hubscher's contention that the Chevron framework governs the court's review of that Commerce's total AFA selection. For Hubscher, the 247.65% rate represents an unreasonable application of the statute under the second prong of Chevron. Pl.'s Br. at 15. The court does not agree that the reasonableness of Commerce's corroboration of the total AFA rate is a Chevron issue; it is instead a substantial evidence question in which the court reviews the reasonableness of Commerce's actions against a known legal standard given the facts and circumstances of the administrative record. More specifically, the issue in this case is whether Commerce, to the extent practicable, reasonably confirmed the reliability and relevance of the highest rate in the petition as a reasonable proxy for Hubscher's actual rate plus some built-in increase intended as a deterrent against non-compliance.

**Corroboration**

The administrative record in the first administrative review had limited information, as did the record for the investigation (an "independent source of information" reasonably at Commerce's disposal). Hubscher, for its part, identifies only "three possible alternatives" to the petition rate: (1) Yama's 0.00% rate, (2) the 123.83% separate rate, and (3) a hypothetical rate calculated using Hubscher's U.S. sales data or Yama's factors of production ("FOP") data from the investigation, with all three rates including some unspecified "factor" added "for deterrence." Pl.'s Reply to Def.'s and Def.-Intervenor's

Resp. Brs. to Pl.'s R. 56.2 Mot. at 6-7; see Pl.'s Br. at 25-26.[3]  Commerce explained that the first two are not valid alternatives because those rates were assigned to cooperative parties.  See Decision Memorandum at 10 ("The Department is not required to assign to an uncooperative respondent such as Hubschercorp a rate assigned to cooperative respondents in the same case.").  Hubscher's last proposed alternative, a hypothetical rate using Hubscher's U.S. sales data or Yama's FOP data from the investigation, is more illusory than real because Hubscher provides no calculation.  Hubscher also apparently failed to make this specific argument before the agency.  The Decision Memorandum contains no reference to an argument by Hubscher that Commerce should calculate a more reasonable total AFA rate for Hubscher based on its record information.  See Memorandum at 4-5 (summarizing Hubscher's arguments before Commerce); see also 19 C.F.R. § 351.309(c)(2) ("The case brief must present all arguments that continue in submitter's view to be relevant to the final determination."); Bestpak, 716 F.3d 1370, 1381.

Along with apparently limited total AFA proxy choices, Commerce had limited data from which to conduct its corroboration.  Commerce did, however, attempt to piece

---

[3] The court notes that there may be other alternatives, for example, ones derived directly from Yama's transaction specific margins, such as an average of a subset of those margins, see, e.g., Qingdao Taifa Group Co. v. United States, 35 CIT ___, ___, 780 F. Supp. 2d 1342, 1347 (2011) ("Commerce calculated the weighted-average margin of 145.90% using data from the sales of the three models with the highest margins, which accounted for 36% of Taifa's total sales by quantity."); Lifestyle Enter., Inc. v. United States, 37 CIT ___,___, 896 F. Supp. 2d 1297, 1301-02 (2013) ("Commerce decided to look at only the top 15% of these ranked Yihua Timber sales.  Commerce then took the simple average of these weighted-average dumping margins for each product type to arrive at an 83.55% margin for Orient." (citations omitted)), but Hubscher did not propose any of these alternatives before Commerce.  See Corroboration Memorandum at 2 ("Hubschercorp does not offer an alternative analysis for the Department to consider . . . .").

together a connection between Hubscher and the petition rate. As Commerce explained, during the period of review Hubscher sourced its subject merchandise from Yama. Yama, in turn, had a number of model-specific transactions during the prior proceeding (the investigation) that fell within the range of the petition rate. Corroboration Memorandum at 3. Because Hubscher purchased all of its subject merchandise from Yama, Commerce inferred that Hubscher's commercial reality reflected these higher-margin transactions. See Decision Memorandum at 9 n.26 ("[I]t is not unreasonable to infer that Hubschercorp could sell subject merchandise to those companies at the same dumping levels.").

Commerce further analyzed Yama's higher-margin transactions to determine if they were somehow unusual or unusable, and concluded, based on both the number of sales and the quantity of ribbons sold, that "there is nothing about those transactions that calls into question their commercial nature or suggests that they were aberrational." Decision Memorandum at 10; see also Corroboration Memorandum at 3 (containing Commerce's analysis of Yama's proprietary data). The number of transactions and the quantity of ribbon in those transactions are not so miniscule as to be immaterial. Cf., e.g., Dongguan Sunrise Furniture Co. v. United States, 36 CIT ___, ___, 865 F. Supp. 2d 1216, 1232-34 (2012) (remanding AFA rate to Commerce for further consideration because transactions purporting to corroborate rate were "miniscule").[4] Hubscher has also not

---

[4] Specifically, Commerce noted that it analyzed [[ ]] Yama model specific transactions that were higher than the petition rate, and that those transactions amounted to [[ ]] percent by quantity of Yama's total yards of ribbon sold during the period of investigation. Commerce also noted that it "did not include in its corroboration analysis a number of Yama's model-specific margins which were well above the highest margin of [[ ]] percent (up to a margin of [[ ]] percent)." Corroboration Memorandum at 3 (emphasis in original).

Court No. 13-00071                                                                                                    Page 12

argued that those transactions are unusual with respect to quantity or model. <u>Cf. iScholar, Inc. v. United States</u>, 35 CIT ___, ___, Slip Op. 11-04 at 5-7 (Jan. 13, 2011) (sustaining Commerce's use of a cooperating respondent's highest transaction-specific margin as the total AFA rate for uncooperative respondent where the transaction fell within the cooperating respondent's usual quantity and range of models sold).

What Commerce did here was analyze the limited available data and infer that Hubscher's commercial reality reflected Yama's higher-margin transactions. Hubscher has chosen not to refute that inference directly, instead arguing generally that Yama's higher-margin, model-specific data cannot be relevant or material given Yama's low calculated rate (0.00%). <u>See</u> Pl.'s Br. at 15-26; Pl.'s Reply at 1-9. It is, in effect, a common sense argument that the petition rate of 247.65% cannot be reliable or relevant for any other respondent because the only calculated margin from any segment of the proceeding is Yama's zero. Hubscher argues that even though several of Yama's model-specific transactions (for thousands of yards of ribbon) had margins near or greater than the petition rate, Yama sold millions of yards of ribbon, the vast majority of which had no or low margins, meaning the petition rate of 247.65% is aberrational at best, and punitive at worst. From this vantage point, Hubscher invites the court to declare the petition rate unlawful, confident that Yama's rate reflects everyone's commercial reality. <u>See</u> Pl.'s Reply at 3, 5.

The court though is reluctant to accept this invitation. As the <u>Bestpak</u> litigation revealed, Yama's rate does not reflect all respondents' commercial reality. After all, in <u>Bestpak</u>, an otherwise cooperative separate rate respondent argued all along that it was

entitled to Yama's zero, 716 F.3d at 1381, but ultimately voluntarily dismissed the litigation rather than be individually reviewed, conceding that the 123.83% separate rate covered its subject merchandise.  See Form 8 Notice of Dismissal, Yangzhou Bestpak Gifts & Crafts Co. v. United States, No. 10-00295 (USCIT Nov. 13, 2013), ECF No. 76.  The more pressing problem for Hubscher is its apparent unwillingness to directly address Commerce's inference about Hubscher's commercial reality reflecting Yama's higher-margin transactions.  The court anticipated an immediate and vigorous challenge from Hubscher explaining why this inference must be unreasonable.  Hubscher is best positioned to explain from the available data that the 247.34% rate simply cannot reasonably reflect Hubscher's commercial reality.  Recall that Hubscher sourced all its merchandise from Yama.  And yet, Hubscher never offers a specific explanation about its own "commercial reality" from the available information on the record.  The court is left wondering why Hubscher did not do more when Commerce preliminarily assigned it the 247.34% rate corroborated with a small subset of Yama's data.  Hubscher did not request that Commerce move the entire Yama data set onto the record for Hubscher to analyze against its own record data.  That omission, in turn, has left a limited administrative record with limited data against which the court can analyze whether the AFA rate is a reasonably accurate estimate of Hubscher's actual rate albeit with some built-in increase intended as a deterrent against noncompliance.  Hubscher, therefore, passed up an important opportunity to crunch Yama's data against its own data and create a narrative of its own commercial experience to discredit the petition rate as an unreasonable AFA choice.  The court cannot understand why Hubscher let this opportunity pass.  Is this because

Hubscher already knew from analyzing its own cost data (not provided to Commerce) that its "actual" margin was higher than Hubscher could tolerate, perhaps even in the range of the petition rate, or higher, resulting in a litigation strategy to deflect attention away from Hubscher's own data, leaving only general arguments about Yama's data?

In the Final Results, Decision Memorandum, and Corroboration Memorandum Commerce has to the extent practicable offered a reasonable path for the court to conclude that the petition rate of 247.34% may very well be a reasonably accurate estimate of Hubscher's actual rate, albeit with some built-in increase intended as a deterrent to noncompliance. In the court's view, Hubscher has left too much unexplained and has not met its burden to demonstrate the unreasonableness of Commerce's corroboration, see 28 U.S.C. § 2639(a)(1) ("[T]he decision of . . . the administering authority . . . is presumed to be correct. The burden of proving otherwise shall rest upon the party challenging such decision.").

Although courts are generally suspicious of petition rates, see, e.g., de Cecco, 216 F.3d at 1032-33; Gallant Ocean, 602 F.3d at 1324; but see Universal Polybag Co. v. United States, 32 CIT at 918-22, 577 F. Supp. 2d at 1298-1301 (sustaining highest rate in petition as total AFA), Congress has not foreclosed their use, see 19 U.S.C. § 1677e(b)(1); de Cecco, 216 F.3d at 1032 ("the statute explicitly allows for use of 'the petition' to determine relevant facts when a respondent does not cooperate."). Commerce's discretion to use a petition rate as total AFA narrows considerably when the record and "independent sources" of information present numerous calculated rates among various respondents, potentially better informing the "commercial reality" or

Court No. 13-00071                                                                                      Page 15

"actual rate" of a non-cooperative party.  That was the case in Gallant Ocean, where dozens of voluntary respondents had received calculated rates that in turn informed the Federal Circuit's analysis of the reasonableness of Commerce's use of a petition rate as AFA.  Gallant Ocean, 602 F.3d at 1323-24.  Here, in the investigation and first review, there were no voluntary respondents, and only one calculated rate for a mandatory respondent.  Commerce noted this difference:

> In the instant case, on the other hand, the Department does not have multiple calculated rates for several respondents, nor were there multiple calculated rates in the original investigation.  Furthermore, unlike in the administrative review underlying Gallant Ocean, the administrative record here does not contain any information to determine whether a previous respondent was "similarly-sized and similarly-situated" to Hubschercorp, and there are not "abundant resources" from which the Department could determine a different rate.

Decision Memorandum at 10.  Hubscher continues to argue that "the facts of its situation mirror" those in Gallant.  Pl.'s Br. at 17.  But they do not.  Here there was "no verified sales data on the record for the relevant period of review," as Hubscher "was the only respondent and it failed to cooperate. . . . Under such circumstances, Commerce's corroboration may be less than ideal because the uncooperative acts of the respondent has deprived Commerce of the very information that it needs to link an AFA rate to [respondent's] commercial reality."  Qingdao Taifa Group Co. v. United States, 35 CIT ___, ___ 780 F. Supp. 2d 1342, 1349 (2011).  Congress understood this type of information shortfall might occur when it included the proviso, "to the extent practicable," within Commerce's corroboration requirement.  See 19 U.S.C. § 1677e(c); H.R. Rep. No. 103-826, pt. 1 at 105 (1994), reprinted in 1994 U.S.C.C.A.N. 3773, 1994 WL 548728.

("The fact that corroboration may not be practicable in a given circumstance will not prevent the agencies from applying an adverse inference under subsection (b).").

Plaintiff does not argue or suggest that Commerce is to blame for the limited number of calculated rates (or the lack of verified transaction data from other respondents beside Yama). This is understandable. As has often been explained, Commerce does not have subpoena power and cannot compel participation in antidumping proceedings. See Essar Steel Ltd. v. United States, 678 F.3d 1268, 1276 (Fed. Cir. 2012) ("Because Commerce lacks subpoena power, Commerce's ability to apply adverse facts is an important one."). Although Commerce may designate mandatory respondents, there is no guarantee those respondents will cooperate or participate. Here, over the course of the investigation and first review, one mandatory respondent cooperated, and two did not. And even Bestpak, one of the separate rate respondents that expended significant time, energy, and expense to litigate the general issue of the separate rate, ultimately chose not to be individually reviewed, voluntarily dismissing its separate rate litigation. See Form 8 Notice of Dismissal, Yangzhou Bestpak Gifts & Crafts Co. v. United States, No. 10-00295 (USCIT Nov. 13, 2013), ECF No. 76. There were eleven other separate rate respondents in the investigation. Another came forward in the instant review. None chose to be voluntarily reviewed. And if Bestpak is an indicator, even if Commerce had designated five mandatory respondents, each may not have cooperated, yielding five additional total AFA rates, five separate corroboration analyses and memoranda, all of which would not further enlighten us about the commercial reality of this particular industry. Commerce's inability to mandate participation in its proceedings means that

Court No. 13-00071                                                                                                    Page 17

interested parties bear the primary burden of developing the administrative record. See QVD Food Co. v. United States, 658 F.3d 1318, 1325 (Fed. Cir. 2011). In Gallant Ocean there were many willing and cooperative voluntary respondents who assumed that burden. Here, there were none.

Since Gallant Ocean the Court of International Trade has in two cases suggested that when Commerce assigns a total AFA rate "in multiples of 100 percent, a bit more corroboration or record support is warranted." Qingdao Taifa Group Co. v. United States, 34 CIT ___, ___, 760 F. Supp. 2d 1379, 1386 n.7 (2010) (holding unreasonable Commerce's corroboration of total AFA rates of 383.60% and 227.73%), appeal after third remand, 780 F. Supp. 2d 1342 (sustaining Commerce's corroboration of lower revised total AFA rate of 145.90%); Lifestyle Enterprise, Inc. v. United States, 35 CIT ___, ___, 768 F. Supp. 2d 1286, 1298 (2011) (holding unreasonable Commerce's corroboration of 216.01% total AFA rate: "As the rate becomes larger and greatly exceeds the rates of cooperating respondents, Commerce must provide a clearer explanation for its choice and ample record support for its determination."), after remand, 36 CIT ___, 844 F. Supp. 2d 1283, 1288-91 & n.7 (2012) (holding unreasonable Commerce's further attempted corroboration of 216.01% rate: "[Petitioner] could not point to any evidence on or off the record supporting its assertion that any large manufacturing company in any sector was dumping at a rate over 200%. Indeed, the idea that a large profit-seeking corporation deemed separate from the country-wide entity would dump its merchandise at rates over 200% seems inconsistent with commercial reality, absent some evidence to the contrary."), after second remand, 36 CIT ___, 865 F. Supp. 2d 1284 (2012) (holding

unreasonable Commerce's corroboration of lower revised total AFA rate of 130.81%), after third remand, 37 CIT ___, 896 F. Supp. 2d 1297 (2013) (sustaining Commerce's corroboration of lower revised total AFA rate of 83.55%).

Qingdao and Lifestyles, two cases that Hubscher does not cite or discuss, both involved proceedings with ample data and "abundant resources," Gallant Ocean, 602 F.3d at 1324, which in turn significantly limited Commerce's discretion to choose otherwise high AFA margins in multiples of 100 percent. Commerce's discretion here, however, was no so limited. Commerce designated Hubscher as a mandatory respondent. When Hubscher withdrew, Hubscher knew there were limited AFA proxies from which to choose, and limited data from which to practicably corroborate the rate. Hubscher sourced its entire inventory of subject merchandise from Yama, a fact Commerce utilized to practicably tie the petition rate to Hubscher through Yama's higher-margin transactions, which were near or above the petition rate. Perhaps, over time, as more calculated rates emerge, the highest rate in the petition may be discredited and proven an unreasonable AFA proxy. At this juncture, however, Commerce appears to have reasonably corroborated that rate, "to the extent practicable," and correspondingly, Hubscher has failed to persuade the court that Commerce's selection of that rate and accompanying corroboration is unreasonable.

**Government Ownership or Control**

Hubscher also argues that 247.65% is "punitive" because Commerce also used the petition rate as the China-wide rate. Pl.'s Reply at 6-7; see Pl.'s Br. at 24-25. According to Hubscher this means that Commerce implicitly found that Hubscher was

subject to government ownership or control even though it has no ties to the Government of China. Id. This is a straw man argument. Commerce never found, directly or implicitly, that Hubscher was subject to government control. What Commerce did was use the highest rate in the petition twice, first as the China-wide rate in the investigation, and second, as total AFA for Hubscher in the first administrative review. Commerce did not conflate the two, repeatedly referring to Hubscher's AFA margin as the "petition rate," not the China-wide rate. Compare Decision Memorandum at 4, 6, 9-11 (describing Hubscher's AFA rate as being the highest petition rate, not the China-wide rate), with LTFV Final Results, 75 Fed. Reg. at 41,810-11 (continuing preliminary application of the "PRC-wide rate" as AFA to an uncooperative mandatory respondent because of its failure to answer questionnaire regarding government ownership and control); Lifestyle Enterprise, Inc. v. United States, 35 CIT ___, ___, 768 F. Supp. 2d 1286, 1298 n.12 (2011) ("This claim lacks merit as Commerce did not assign the PRC-wide rate per se, but rather selected the same rate based on separate considerations."), after remand, 36 CIT ___, 844 F. Supp. 2d 1283 (2012), after second remand, 36 CIT ___, 865 F. Supp. 2d 1284 (2012), after third remand, 37 CIT ___, 896 F. Supp. 2d 1297 (2013); cf. Gerber Food (Yunnan) Co. v. United States, 29 CIT 753, 771-73, 387 F. Supp. 2d 1270, 1287-88 (2005), after remand 31 CIT 921, 491 F. Supp. 2d 1326 (2007), after second remand, 32 CIT 995 (2008) (remanding selection of country-wide rate as AFA because, among other reasons, Commerce unreasonably made an implicit finding of government ownership or control).

## IV. Conclusion

For the foregoing reasons Hubscher's motion for judgment on the agency record is denied.  Judgment will be entered accordingly.

/s/ Leo M. Gordon
Judge Leo M. Gordon

Dated:    April 15, 2014
         New York, New York